**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| ANJENETTE WHITTED, | CASE NO. 23-CV-1732-AMK |
| Plaintiff, |  |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. |  |

Plaintiff Anjenette Whitted ("Plaintiff" or "Ms. Whitted") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF Doc. 5.) For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I.      Procedural History

Ms. Whitted filed her DIB and SSI applications on February 25, 2021, alleging a disability onset date of March 2, 2020. (Tr. 189, 196.) She asserted disability due to post traumatic stress disorder, chronic depression, anxiety, and grief. (Tr. 50, 68.) Ms. Whitted's applications were denied at the initial level on July 27, 2021 (Tr. 95, 100) and at the reconsideration level on November 5, 2021 (Tr. 112, 117). She then requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 127-29, 150-65.)   A telephonic hearing was held

before an ALJ on June 22, 2022.  (Tr. 37-49.)  The ALJ issued an unfavorable opinion on January 27, 2022.  (Tr. 27.)

Ms. Whitted's request for review of the decision by the Appeals Council was denied on July 3, 2023 (Tr. 1-6), making the ALJ's decision the final decision of the Commissioner. Ms. Whitted filed her Complaint seeking judicial review on February 16, 2023.  (ECF Doc. 1.) The case is fully briefed and ripe for review.  (ECF Docs. 9, 11.)

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Ms. Whitted was born in 1970 and was 49 years old on the alleged disability onset date, making her a younger individual on the alleged disability onset date, and an individual closely approaching advanced age as of the ALJ's decision under Social Security regulations.  (Tr. 25, 289.)  She had at least a high school education.  (*Id*.)  Ms. Whitted has not engaged in substantial gainful activity since the alleged onset date.  (*See* Tr. 68.)

### B.  Medical Evidence

Although the ALJ identified both physical and mental impairments (Tr. 13), Ms. Whitted focuses her argument on a consultative examiner's psychological medical opinion and the ALJ's mental RFC assessment (*see* ECF Doc. 9).  The evidence summarized herein is therefore focused on the evidence relevant to her mental impairments.

#### 1.  Relevant Treatment History

On January 14, 2019, Ms. Whitted had a mental health assessment and medication management appointment with Sharon Roesner, APRN-CNP, at MetroHealth Medical Center. (Tr. 282-285.)  Ms. Whitted's chief complaint was that she felt "like a zombie" on 20 mg of Celexa twice daily; she also reported increased depression, difficulty sleeping, weight gain, and

feelings of guilt, hopelessness, and helplessness regarding her children.  (Tr. 282.)  Ms. Whitted

denied symptoms related to anxiety, psychosis, mania, OCD, or self-mutilation.  (Tr. 282-83.)

Mental status findings were unremarkable except for a depressed mood.  (Tr. 285.)  CNP

Roesner confirmed her prior diagnosis of Major Depressive Disorder, recurrent, moderate.  (Tr.

284-85.)  Ms. Whitted's medications were adjusted, decreasing Celexa and adding bupropion and

Ambien.  (Tr. 286.)  CNP Roesner advised a follow-up in two months.  (*Id.*)

On March 14, 2019, Ms. Whitted had a counseling appointment with Elliot Gutow,

LISW, at MetroHealth.  (Tr. 288.)  She presented with flat affect; other mental status findings

were unremarkable.  (Tr. 289-90.)  Ms. Whitted discussed her son's death and said she had

started to cook again.  (Tr. 288.)  LISW Gutow indicated her symptoms were in partial remission

and suggested weekly appointments for the next three weeks.  (Tr. 289.)

Ms. Whitted had a medication management appointment with CNP Roesner on March 22,

2019.  (Tr. 292.)  She presented with a flat affect and dysphoric mood.  (*Id.*)  Ms. Whitted stated

that her symptoms were exacerbated by a shooting outside her home which she witnessed.  (*Id.*)

The shooting brought back memories of when her son was shot, and she was having flashbacks

and feelings of being held down on the bed and not able to breathe.  (Tr. 293.)  Ms. Whitted

reported that her medications were not providing relief.  (*Id.*)  CNP Roesner assessed her with

continued depression and adjusted her medications by discontinuing Celexa and prescribing

Zoloft and Prazosin.  (*Id.*)  A two-month follow-up was advised.  (Tr. 294.)

On August 22, 2019, Ms. Whitted had a counseling appointment with Elevani Fletcher,

LPCC-S[1] at MetroHealth.  (Tr. 294.)  She reported a low mood, feeling overwhelmed, and

continued grief about the death of her son in 2017.  (*Id.*)  She also reported increased stress over

---

[1] Ms. Whitted was transferred from LISW Gutow to LPCC Fletcher.  (*See* Tr. 294.)

finances and physical health.  (*Id*.)  Her mental status examination was notable for dysphoric mood, guarded behavior, and tight associations.  (Tr. 294.)

Ms. Whitted saw LPCC Fletcher again on August 28, 2019.  (Tr. 297.)  She reported low mood, visual hallucinations of the covers moving while she was in bed and seeing her deceased son with a group of people in her home.  (*Id*.)  Ms. Whitted said she signed over her home to a couple due to outstanding taxes and housing violations.  (*Id*.)  Her mental status examination was notable for dysphoric mood, guarded behavior, and tight associations.  (Tr. 298.)

On October 31, 2019, Ms. Whitted saw CNP Roesner for a medication management appointment.  (Tr. 317.)  She reported feeling somewhat better with Zoloft but said she was still tired.  (*Id*.)  She had stopped taking bupropion because she mistakenly thought that she had to; she agreed to start taking it again with the Zoloft to see how she felt then.  (*Id*.)  Her mental status examination was notable for depressed mood and flat affect.  (Tr. 318.)  CNP Roesner noted that she remained depressed but was "less depressed than before."  (*Id*.)  Zoloft was increased and Xanax was added for panic attacks; CNP Roesner instructed Ms. Whitted to break the Xanax tablets in half, and to only use them as needed for anxiety and panic.  (Tr. 317.)

At her next medication management appointment, on December 30, 2019, Ms. Whitted reported feeling overwhelmed.  (Tr. 328.)  She said she wanted to be in her house "to have a good cry" but felt like she could not because her grandchildren were over all of the time.  (*Id.*)  She was not able to summon the strength for laundry or attending appointments, and she worried about her son; he was in mental health treatment and not doing well.  (*Id*.)  Ms. Whitted reported some visual hallucinations with Ambien.  (*Id*.)  Her mental status examination was notable for slow but clear and soft speech, depressed mood with indifference to living or dying, flat affect

4

with eye contact, and fair judgment and insight. (*Id.*) No changes were made to her medications, and a two-month follow-up was advised. (Tr. 329.)

Ms. Whitted saw CNP Roesner again on March 6, 2020, and reported that her medications helped her depression, that Ambien was not causing more problems, and that Xanax helped but did not totally resolve her anxiety. (Tr. 351-52.) Her mental status examination was notable for "somewhat depressed" mood and slow but soft and clear speech. (Tr. 352.)

At a follow-up appointment with CNP Roesner on May 21, 2020, Ms. Whitted said she had a hard time going anywhere and had not left the house in a month, and that mask wearing caused anxiety. (Tr. 355.) Her mental status findings were notable for anxious mood, and her prazosin was increased. (*Id.*) A three-month follow-up was advised. (Tr. 356.)

On June 23, 2020, Ms. Whitted called the MetroHealth nurse hotline to report that she had attended a work orientation for Amazon, where she had possibly been exposed to Covid-19. (Tr. 396.) A telephone appointment was scheduled for June 26, 2020, but was canceled after Ammaji Narra, M.D., called twice with no answer. (*Id.*)

 On December 23, 2020, Ms. Whitted had a medicine management appointment via telehealth with CNP Roesner. (Tr. 369.) Ms. Whitted said she had been having a stressful time and was getting her house ready to start a day care. (Tr. 370.) She was not currently living in her house because she was frightened of gun shots, remembering the events from before when "somebody shot her house up bottom to top." (*Id.*) Ms. Whitted said she was going to sell her house and move somewhere safer, but she had to get the bullet holes fixed. (Tr. 371.) She was not sure she was going to be able to re-do her daycare and was going to call a lawyer to retry for disability. (*Id.*) Her mental status examination was notable for fearful behavior, pressured and scared speech, and anxious/depressed mood. (*Id.*) CNP Roesner's impression was that Ms.

Whitted was "not doing well" and was "having nightmares and panic and depression ha[d] increased."  (*Id.*)  Ms. Whitted did not want a change in her medications, and no changes were made.  (*Id.*)  A three-month follow-up was advised.  (Tr. 372.)

At her follow-up with CNP Roesner on March 17, 2021, Ms. Whitted reported that she was caring for one child at her daycare after she found that she was unable to manage caring for two.  (Tr. 374.)   On mental status examination, she was fearful, anxious, and depressed, with pressured and anxious speech.  (Tr. 374-75.)  No changes to were made to Ms. Whitted's treatment plan and a three-month follow-up was advised.  (Tr. 375.)

At a follow-up appointment with CNP Roesner on June 10, 2021, Ms. Whitted reported that she was feeling overwhelmed with family responsibilities and grieving her son, who she had lost around the same time in 2017.  (Tr. 717.)  She was thinking of checking herself into the hospital, but she needed to "press on" because she had to take care of her grandchildren.  (*Id.*)  On a mental status examination, she displayed pressured and anxious speech, and an anxious, depressed mood.  (*Id.*)   CNP Roesner's impression was that Ms. Whitted was "not doing well" and still had depression and anxiety.  (*Id.*)  No changes were made to her medications, but follow-up was recommended in one month.  (*Id.*)

At her one-month follow-up on July 9, 2021, CNP Roesner again indicated that Ms. Whitted was "not doing well" with regard to her depression and anxiety.  (Tr. 725.)  Ms. Whitted reported feeling "overwhelmed" with feeling responsible for her family and taking care of her grandchildren.  (*Id.*)  Mental status findings were the same as the prior month, with pressured / anxious speech and an anxious, depressed mood.  (*Id.*)  No changes were made to her medications and a one-month follow-up was recommended.  (Tr. 726.)

At a September 3, 2021 follow-up with CNP Roesner, Ms. Whitted reported she was having a bad day; she had been watching three or four kids but had to stop due to pain and her disability application was declined so she had no money coming in.  (Tr. 773-74.)  Mental status findings were notable for pressured, anxious speech and anxious/depressed mood.  (Tr. 775.)  She had stopped taking her medications but was going to get them filled that day.  (*Id*.)  No medication changes were made; a one-month follow-up was recommended.  (Tr. 775-76.)

On April 13, 2022, Ms. Whitted had an appointment with family medicine practitioner April Black, APRN-CNP.  (Tr. 857.)  They discussed her physical and mental health symptoms.  (*See* Tr. 859.)  Ms. Whitted told CNP Black she had not had behavioral health since her last provider passed away.  (Tr. 857.)  Ms. Whitted reported that she still struggled with sleep and grief over the loss of her son; she was fatigued but could not sleep without medication.  (*Id*.)  She said she had an upcoming behavioral health appointment.  (Tr. 859.)

On April 23, 2022, Ms. Whitted had an appointment with Carrie Lingro, APRN-CNP, at MetroHealth, for mental health update and pharmacological management.  (Tr. 872.)  CNP Lingro reviewed CNP Roesner's initial diagnostic assessment.  (*Id*.)  Ms. Whitted reported that she had been going downhill, and that she tried going to work as a service coordinator at a food pantry, but the job was too overwhelming.  (*Id*.)  She reported laying in her room and pretending to be asleep when family called, panic attacks, being unable to motivate to do laundry or clean, and withdrawing from friends and family.  (Tr. 873.)  Ms. Whitted said she felt miserable and bitter, like she was about to have a mental breakdown, and did not care if she woke up.  (*Id*.)  Her mental status examination was notable for a depressed, anxious mood but with full affect.  (Tr. 879.)  CNP Lingro's diagnostic impression was PTSD, Major Depressive Disorder, and differential diagnosis of Generalized Anxiety Disorder.  (*Id*.)  Ms. Whitted's medications were

adjusted, with the addition of Prozac and the continuation of Xanax, Wellbutrin, and Ambien. (*Id.*)  Abilify was to be considered if improvement was not achieved.  (*Id.*)  CNP Lingro advised monthly appointments, moving to quarterly after her symptoms had stabilized.  (Tr. 882.)

Ms. Whitted returned to CNP Lingro for a medication management visit on May 20, 2022.  (Tr. 888.)  She continued to struggle with anxiety and found Ambien no longer helped her sleep.  (*Id.*)  She had been working at the food pantry but quit because they changed the pantry around and threw several things away that she was going to give to children.  (Tr. 890.)  Her mood was anxious but other mental status findings were unremarkable.  (*Id.*)  CNP Lingro instructed her to wean Zoloft, start Prozac, and continue Xanax, Wellbutrin, and Ambien.  (Tr. 891.)  A follow-up in one month was recommended.  (Tr. 893.)

### 2. Opinion Evidence

#### i. Consultative Examination

On May 10, 2021, consultative examiner Natalie Whitlow, Ph.D. conducted a psychological evaluation of Ms. Whitted at the request of the state agency.  (Tr. 500-08.)  Dr. Whitlow's sources of data were a 60-minute clinical interview with Ms. Whitted and a December 11, 2020 pharmacy note.  (Tr. 501.)  Ms. Whitted reported difficulty sleeping, nightmares, panic attacks, shutting down, crying spells, isolation, and forgetfulness.  (*Id.*)  Since her son's death, she said she was easily triggered and found herself reliving what happened.  (Tr. 501-02.)  When that happened, she would "zone out," cry, or have a panic attack.  (Tr. 503.)  She also reported poor eating habits, poor personal hygiene, and trouble socializing.  (Tr. 504.)

On mental status examination, Dr. Whitlow observed that Ms. Whitted minimally attended to her personal hygiene and was slightly disheveled.  (Tr. 504.)  At the onset of the evaluation, Ms. Whitted began crying, shaking, and displaying psychomotor agitation,

8

unsolicited.  (*Id.*)  But she arrived on time, maintained appropriate eye contact, and was cooperative, alert, attentive, and coherent with her communication.  (*Id.*)  Her speech was within the normative range of functioning, but her thought processing was fixated on the trauma of losing her son and appeared to interfere with her cognitive functioning.  (*Id.*)  Her affect was extremely sad, fragile, depressed, and "inappropriate" given the intensity of her affective state and the severity of her sadness and depression.  (Tr. 505.)  She did not present with significant, observable, or readily identifiable signs of anxiety during the evaluation.  (*Id.*)  She was oriented to person, place, time, and event, and appeared to possess average cognitive functioning.  (*Id.*)  Her insight was fair, but her judgment was "poor" because she reported and presented as engaging in behaviors, thought processing, and decision-making that was driven by mental health symptomology and served to debilitate her functioning.  (Tr. 506.)

> Overall, Dr. Whitlow observed that Ms. Whitted:
>
> presented with significant and severe signs of depression and PTSD that were demonstrated through her emotional fragility, her disheveled presentation, her excessive crying, her psychomotor agitation, her fixation on telling the story of her son's death, and her scattered thinking and communication patterns.

(Tr. 503.)  She assessed Ms. Whitted's mental health prognosis as "poor" because of the severity and longevity of her reported symptoms, including a reported increase in frequency, intensity, and severity, her history of the death of her son, her reports of the significant ways her symptoms impaired her day-to-day functioning, and her presentation at the evaluation with "significant and severe mental health signs" that impacted her functioning and performance.  (Tr. 506.)  Dr. Whitlow found Ms. Whitted's reports to be reliable, and concluded:

> [I]t is this evaluator's professional opinion that the claimant's mental health symptoms cause her to have impairments with engaging in the many aspects of the work world related to decision-making, impulse control, anger and behavior management, interpersonal interactions, and complying with directives.

(Tr. 507.)

Dr. Whitlow then provided the following functional assessment:

- ***Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.***

  From a mental health perspective, the claimant does not appear to have limitations with understanding or remembering instructions.

  The claimant appears to have limitations with carrying out instructions, which is evidenced by her MDD with anxious distress and psychotic features and PTSD diagnoses that have accompanying symptoms that cause her to experience diminished levels of motivation, drive, energy, care, or a sense of greater life purpose.

- ***Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks.***

  From a mental health perspective, the claimant does not appear to have limitations with maintaining attention, concentration, and mental persistence.

  The claimant appears to have limitations with following through on tasks and completing tasks, which is evidenced by her MDD with anxious distress and psychotic features and PTSD diagnoses that have accompanying symptoms that cause her to experience diminished levels of motivation, drive, energy, care, or a sense of greater life purpose.

- ***Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.***

  Based off of the information presented in this clinical interview, the claimant does not appear to have debilitating limitations on this functional assessment area.

- ***Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.***

  The claimant appears to have limitations on this functional assessment area, which is evidenced by her MDD with anxious distress and psychotic features and PTSD diagnoses that have accompanying symptoms that impair her ability to engage in regular and responsible attendance, to possess adequate level of care drive, and motivation to present professionally, appropriately interact with others, or to do an exemplary job at completing her work and having adequate performance.

(Tr. 507-08.)

### ii. State Agency Medical Consultants

Upon initial review, on July 27, 2021, state agency psychological consultant Kristen Haskins, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 52-53) and Mental RFC Assessment (Tr. 54-57).  In the PRT, Dr. Haskins found that Ms. Whitted had moderate limitations in concentrating, persisting, and maintaining pace, and adapting and managing oneself; and mild limitations in understanding, remembering, or applying information, and interacting with others.  (Tr. 53, 61.)  Ms. Whitted retained the capacity to: perform short cycle work; without strict time limitations or production standards; within a set routine where major changes are explained in advance and gradually implemented; and in a setting away from the distraction of others.  (Tr. 55, 63.)

Upon reconsideration, on October 22, 2021, state agency psychological consultant Deryck Richardson, Ph.D., affirmed Dr. Haskins's PRT (Tr. 70-73) and mental RFC (Tr. 79-82).

### 3. Hearing Testimony

### i. Plaintiff's Testimony

Ms. Whitted appeared for a telephonic hearing on June 22, 2022 (Tr. 37-49), where she was represented by counsel (Tr. 39).  Ms. Whitted had a high school education plus one year of college.  (Tr. 40.)  Between 2010 and 2016, she worked in a drug reentry prevention program as an outreach worker, helping clients coming out of incarceration.  (*Id*.)  Ms. Whitted also previously worked as a youth counselor for a community center.  (Tr. 41.)

Ms. Whitted said she became disabled on March 2, 2020, when she witnessed a shooting outside of her home.  (Tr. 41-42.)  That event triggered memories from the loss of her son, who died in 2017.  (Tr. 42.)  On a typical day, she would sometimes get up and brush her teeth.  (*Id.*)  Other days, she would stay in bed and try to get up and take her meds.  (*Id*.)  Her medication had

been adjusted and it was helping her moods; she was getting up more and trying to clean.  (*Id.*)

In the evening, her friend cooked dinner around 6:00 p.m.  (*Id.*)  After that, Ms. Whitted took her

evening medications and went to bed.  (*Id.*)  Her new psychiatrist changed her medications to

help her sleep and to improve her mood and anxiety.  (Tr. 43.)  Ms. Whitted was also on

medication to help her with the side effects from the other medications.  (*Id.*)

Upon examination by her attorney, Ms. Whitted said there were days she did not get out

of bed or take care of her hygiene.  (Tr. 43.)  That had happened for stretches of over two weeks.

(*Id.*)  Her family or friends would try to get her out of bed during those spells, but it was hard

because she would just want to go lay back down.  (Tr. 44.)  She also reported that there were

periods in the last two years when she felt better.  (Tr. 44.)  One example was when she was

trying to get back into daycare, and she did a little bit at a time to prepare her house; she felt the

medications were working well at that time.  (*Id.*)  Then the shooting in front of her house

pushed her back into her mental health symptoms and she stopped preparing her house.  (Tr. 45.)

## ii.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 45-49.)  He testified that a

hypothetical individual of Ms. Whitted's age, education, and work experience, with the

functional limitations described in the RFC determination, could not perform Ms. Whitted's past

relevant work, but could perform representative positions in the national economy, like industrial

cleaner, kitchen helper, and bagger.  (Tr. 47.)  If the person was off task more than 10% of the

time or would be absent more than eight days per year, the VE testified that would preclude

competitive employment.  (Tr. 48.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L.

Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform other work available in

the national economy.  *Id.*

## IV.    The ALJ's Decision

In his August 9, 2022 decision, the ALJ made the following findings:[2]

1.    The claimant met the insured status requirements of the Social Security
      Act through December 31, 2021.  (Tr. 12.)

2.    The claimant had engaged in substantial gainful activity since March 2,
      2020, the alleged onset date.  (Tr. 13.)

3.    The claimant had the following severe impairments: obesity; right-sided SI
      joint dysfunction; depression; and post-traumatic stress disorder (PTSD).
      (*Id.*)

4.    The claimant did not have an impairment or combination of impairments
      that meets or medically equals the severity of the listed impairments in 20
      C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

5.    The claimant has the residual functional capacity to perform medium work
      as defined in 20 CFR 404.1567(c) and 416.967(c) except: she can lift
      and/or carry up to 50 pounds occasionally, 25 pounds frequently, stand for
      six hours in an eight-hour workday, walk for six hours in an eight-hour
      workday, and sit for six hours in an eight-hour workday. She can
      continuously push/pull and operate foot pedals. She has no postural,
      manipulative, visual, communication, or environmental limitations. She
      can do no complex tasks but can do simple (routine) tasks which I define
      to mean this person has the basic mental aptitude to meet the demands of
      competitive, remunerative, unskilled work including the abilities to, on a
      sustained basis, understand, carry out, and remember simple instructions.
      She can do detailed, but not complex tasks. She can make simple work-
      related decisions. She can respond appropriately to supervision,
      coworkers, and usual work situations; and can deal with changes in routine

---

[2] The ALJ's findings are summarized.

14

work settings. She can focus attention on simple or routine work activities for at least 2 hours at a time and can stay on task at a sustained rate such as initiating and perform a task that they understand and know how to do. She can work at an appropriate and consistent pace and can complete tasks in a timely manner. She can ignore or avoid distractions while working; can change activities or work settings without being disruptive. She can do no high production quotas or piece rate work. And she can have superficial, occasional interactions with public, co-workers meaning limited to speaking, signaling, taking instructions, asking questions and similar contact but with no arbitration, negotiation, confrontation, supervision, or commercial driving.  (Tr. 15-16.)

6.    The claimant is unable to perform any past relevant work.  (Tr. 25.)

7.    The claimant was a younger individual on the alleged onset day but subsequently changed age category to closely approaching advanced age. (*Id.*)

8.    The claimant has at least a high school education.  (*Id.*)

9.    Transferability of job skills is not material to the determination of disability.  (*Id.*)

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (Tr. 26.)

Based on the foregoing, the ALJ determined that Ms. Whitted had not been under a disability, as defined in the Social Security Act, from the alleged disability onset date through the date of the decision.  (Tr. 27.)

## V.    Plaintiff's Arguments

Ms. Whitted presents two assignments of error.  First, she argues that the ALJ erred in evaluating the persuasiveness of the medical opinion of consultative examiner Natalie Whitlow, Ph.D.  (ECF Doc. 9, pp. 1, 10-13.)  Second, she argues that the ALJ erred in evaluating the mental RFC because the RFC was not supported by substantial evidence and the ALJ's analysis lacked a "logical bridge."  (*Id.* at pp. 1, 13-15.)

## VI.    Law & Analysis

**A.    Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the

Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030

(6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th

Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence

shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006)

(citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a

zone of choice within which the decisionmakers can go either way, without interference by the

courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide

questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if

substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**     **First Assignment of Error: The ALJ Did Not Err in Evaluating the Persuasiveness of the Medical Opinion of Consultative Examiner Natalie Whitlow, Ph.D.**

In her first assignment of error, Ms. Whitted argues that the ALJ erred in finding the medical opinion of consultative examiner Dr. Whitlow "unpersuasive" because the ALJ's findings were "contradicted by [Dr. Whitlow's] own evaluation of the claimant, the specific limitations in [Dr. Whitlow's] report, and the entirety of the record," and because the ALJ failed to address specified supportive findings from Dr. Whitlow's report. (ECF Doc. 9, pp. 11-12.) The Commissioner argues in response that the ALJ's findings regarding Dr. Whitlow's opinion were supported by substantial evidence and adequately explained. (ECF Doc. 11, pp. 9-10.)

**1.**     **Framework for Evaluation of Medical Opinion Evidence**

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation. 20 C.F.R. § 404.1520c(a); *see Jones*

17

*v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors. 20 C.F.R. § 404.1520c(c)(1)-(5). The most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2). ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors. 20 C.F.R. § 404.1520c(b)(2).

### 2. The ALJ Adequately Evaluated the Persuasiveness of Dr. Whitlow's Opinion

The ALJ evaluated the persuasiveness of Dr. Whitlow's opinion as follows:

> The opinions of the consultative examiner, Natalie Whitlow, PhD, were underpersuasive. The claimant attended the consultative examination in May of 2021 []. Dr. Whitlow gave the claimant a poor prognosis []. She opined that the claimant's mental health impairments caused her to have impairments with engaging in the many aspects of the work world related to decision-making, impulse control, anger and behavior management, interpersonal interactions, and complying to directives []. She opined that the claimant did not appear to have limitations with understanding or remembering instructions; but she did have limitations with carrying out instructions, due to her impairments, which led to diminished levels of motivation, drive, energy, care, or a sense of greater life purpose []. She did not appear to have limitations with maintaining attention, concentration, and mental persistence; but she appeared to have limitations with following through on tasks and completing tasks []. She did not appear to have debilitating limitations interacting with others []. And she appeared to have limitations in the area of adapting or managing oneself due to her symptoms, which impaired her ability to engage in regular and responsible attendance, possess adequate levels of care, drive, and motivation to present professionally, appropriately interact with others, or to do an exemplary job at completing her work and having adequate performance [].
>
> The opinions of the consultative examiner were unpersuasive for multiple reasons. As an initial matter, I note that the consultative examiner is an acceptable medical source. Furthermore, she has knowledge and understanding of our programs, policies, and requirements. And her opinions were based on her in-person examination of the claimant. Additionally, the overall conclusion that the claimant had significant mental health impairments, leading to functional limitations was consistent with the record as a whole, including the corresponding examination, and the claimant's history of conservative mental health treatment throughout the period in question, consisting of medication therapy and outpatient mental health services []. However, the opinions of the consultative examiner were not more persuasive because she did not articulate the claimant's limitations within the four

areas of the paragraph B criteria in terms of none, mild, moderate, marked, or extreme. Furthermore, the opinion that the claimant did not appear to have debilitating limitations within the area of interacting with others is vague and imprecise. While she may not have had debilitating limitations within that area, it is unclear whether she felt that the claimant had some degree of limitation within that area. The opinions in the other three areas of the paragraph B criteria are vague and imprecise. She noted that the claimant had some degree of limitation within these areas, but she failed to articulate the extent to which the claimant had limitations within these areas. Finally, the statement that the claimant appeared to have limitations in the area of adapting or managing oneself due to her symptoms, which impaired her ability to engage in regular and responsible attendance was speculative, and somewhat inconsistent with the claimant's history of post-onset work activities in daycare, at Amazon, and at the food pantry. Overall, the opinions of the consultative examiner were minimally helpful in determining the claimant's remaining abilities in functional terms.

(Tr. 24-25 (citations omitted) (emphasis added).)

Ms. Whitted argues first that the ALJ's findings above were "contradicted by [Dr. Whitlow's] own evaluation of the claimant, the specific identification of limitations in her report, and the entirety of the record," highlighting Dr. Whitlow 's observation that Ms. Whitted "presented with significant and severe signs of depression and PTSD that were demonstrated through her emotional fragility, her disheveled presentation, her excessive crying, her psychomotor agitation, her fixation on telling the story of her son's death, and her scattered thinking and communication patterns." (ECF Doc. 9, p. 11 (citing Tr. 503).)

In fact, the ALJ acknowledged Dr. Whitlow's opinion that Ms. Whitted had "significant mental impairments" that caused her "functional limitations," and found Dr. Whitlow's "overall conclusions" to be consistent with Dr. Whitlow's examination findings and Ms. Whitted's history of conservative mental health treatment.  (Tr. 24-25.)  The ALJ had previously discussed[3] Dr. Whitlow's clinical examination findings in the Step Three analysis, in support of his finding

---

[3] An ALJ may rely on previously articulated information to support his opinion analysis.  *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

that Ms. Whitted had moderate limitations in all four categories of mental functioning.  (Tr. 14-15.)  Specifically, the ALJ highlighted Dr. Whitlow's observations that Ms. Whitted: had a disheveled appearance but appropriate eye contact; demonstrated psychomotor agitation but appeared alert and attentive; and had thought processes fixated on her trauma, but also had coherent communication and normal speech.  (*Id.*)  Considering those findings, the ALJ adopted a mental RFC that limited Ms. Whitted to the performance of simple routine tasks with no high production quotas or piece rate work and superficial, occasional interactions.  (Tr. 16.)

But the ALJ explained that Dr. Whitlow's opinion was "not more persuasive" because the functional limitations Dr. Whitlow described were "vague and imprecise" as to the degree of limitation—e.g., none, mild, moderate, marked, or extreme.  (Tr. 24.)  Consistent with the ALJ's observations, Dr. Whitlow's written assessment of the four domains of mental functioning simply states that Ms. Whitted "does not appear to have limitations," "appears to have limitations," or "does not appear to have debilitating limitations" with respect to various activities.  (Tr. 508.)  The ALJ found this vague language to be "minimally helpful in determining [Ms. Whitted]'s remaining abilities in functional terms" (Tr. 25), having already explained that Dr. Whitlow "failed to articulate clearly, in functional terms, the extent of, and the degree to which the claimant had limitations from her impairments" (Tr. 21).

As to Dr. Whitlow's opinion that Ms. Whitted had "symptoms that impair her ability to engage in regular and responsible attendance" at work, the ALJ also found the opinion to be "speculative" and "somewhat inconsistent" with evidence suggestive of post-onset work.  (Tr. 24.)  The ALJ had previously discussed the evidence regarding post-onset work as follows:

> Despite the claimant's allegations of disabling symptoms associated with her multiple impairments since March of 2020, the claimant's treatment notes documented post-onset work activities, and efforts to engage in post-onset work activities. In treatment notes with Dr. Rainey from June of 2020, it was noted that

the claimant worked at a daycare for six kids []. Perhaps this entry was merely a reference to historic work activities, and not an indication of the claimant's work activities in June of 2020. However, there were also treatment notes from June of 2020, indicating that the claimant was working at Amazon []. And in treatment notes from December of 2020, the claimant reported that she was in the midst of getting her house ready to start holding daycare services out of her home []. And in March of 2021, she reported that she was caring for at least one child []. And in subsequent treatment notes from September of 2021, the claimant indicated that she had been providing daycare to four kids but had to stop due to pain symptoms []. However, in April of 2022, she reported that she was working as a service coordinator at a food pantry []. And in May of 2022, she reported that her job at the food pantry had been going well until she took time off to care for her son, and when she went back to work, she found that they had changed the pantry around, leading to her quitting []. It is noteworthy that the claimant's post-onset work activities are not reflected in her earnings records. Regardless, the claimant's post-onset work activities were somewhat inconsistent with her allegations of disabling symptoms during the same period.

(Tr. 22 (citations omitted).)

Thus, the ALJ considered Dr. Whitlow's clinical findings and Ms. Whitted's treatment records, and found they supported moderate limitations in all functional domains and the specific mental limitations articulated in the RFC, but otherwise found: Dr. Whitlow's "vague and imprecise" opinions regarding functional limitations were unpersuasive because they failed to clearly articulate the degree of limitation; and her opinion regarding likely attendance at work was both speculative and somewhat inconsistent with evidence of post-onset work activity. The Court finds the ALJ's analysis was consistent with Dr. Whitlow's report and the record.

Ms. Whitted also argues that the ALJ erred in his analysis of Dr. Whitlow's opinion because his assessment "failed to include the following important finding[s] of Dr. Whitlow":

(1)     Ms. Whitted's thought processes interfere with her cognitive functioning;

(2)     judgment is poor (impacting behavior, thought processes, and decision-making) that debilitate her functioning;

(3)     prognosis is poor;

(4)     presentation is emotionally fragile and unstable; and

21

(5)    mental health symptoms cause her impairments with engaging in many aspects of the work world, related to decision-making, impulse control, anger and behavior management, interpersonal interactions, and complying with directives.

(ECF Doc. 9, p. 12 (citing Tr. 504-07).)  But the ALJ did acknowledge Dr. Whitlow's findings that Ms. Whitted had a "poor prognosis," and that her mental health impairments "caused her to have impairments with engaging in the many aspects of the work world related to decision-making, impulse control, anger and behavior management, interpersonal interactions, and complying with directives."  (Tr. 24 (citing Tr. 506, 507).)  He also considered many of Dr. Whitlow's clinical findings, including: disheveled appearance with appropriate eye contact; psychomotor agitation with an alert and attentive appearance; and thought processes fixated on trauma, but with coherent communication and normal speech.  (Tr. 14-15.)  In this context, consistent with analysis above, the Court finds the ALJ adequately explained his reasons for finding Dr. Whitlow's discussion of limitations and impairments to be "minimally helpful in determining the claimant's remaining abilities in functional terms."  (Tr. 25.)

The fact that the ALJ did not specifically discuss all of the evidence identified in Ms. Whitted's brief does not impact this analysis.  While an ALJ must address the persuasiveness of all medical opinions, *see* 20 C.F.R. § 404.1520c(a), he need not specifically discuss all medical evidence in the record, *see Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (an ALJ is not "required to discuss each piece of data in his opinion, so long as he consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion") (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006)).

Although the ALJ did not discuss Dr. Whitlow's opinion that Ms. Whitted's thought processes interfered with cognitive functioning, he did acknowledge observations that her thought processes were fixated on her trauma and Dr. Whitlow's opinion that she had limitations

22

in carrying out instructions and following through and completing tasks; the ALJ then found Ms. Whitted had moderate limitations in understanding, remembering, and applying information and in concentrating, persisting, and maintaining pace (Tr. 14) and adopted RFC limitations for both areas of functioning (Tr. 16) despite treatment records showing normal memory and sufficient cognitive functioning, and other medical opinions indicating that Ms. Whitted had no more than mild limitations in understanding, remembering, and applying information (Tr. 14).

Similarly, while the ALJ did not cite Dr. Whitlow's findings regarding Ms. Whitted's poor judgment and emotionally fragile and unstable presentation, he did acknowledge her disheveled appearance at the consultative examination and variable moods and behavior during treatment visits; the ALJ then found Ms. Whitted had moderate limitations in interacting with others and adapting and managing herself (Tr. 14-15) and adopted RFC limitations for both areas of functioning (Tr. 16) despite Ms. Whitted's appropriate eye contact at the consultative examination, treatment records showing normal moods and behavior, and medical opinions indicating she had no more than mild limitations in interacting with others (Tr. 14-15).

For the reasons set forth above, the Court finds that Ms. Whitted has not met her burden to show that the ALJ erred in finding Dr. Whitlow's medical opinion to be unpersuasive.  The ALJ appropriately considered the underlying evidence and sufficiently explained his reasons for finding the opinion unpersuasive; and his stated reasons were supported by substantial evidence. Accordingly, the Court finds Ms. Whitted's first assignment of error is without merit.

## C.    Second Assignment of Error: The Mental RFC Analysis Was Supported by Substantial Evidence and Did Not Lack a Logical Bridge

Ms. Whitted offers three separate arguments in support of her second assignment of error, all of which challenge the ALJ's mental RFC finding and analysis.  For the reasons set forth below, the Court finds all three of the arguments lack merit.

A claimant's RFC "is the most [he] can still do despite [his] limitations."  20 C.F.R. §

404.1545(a)(1).  An ALJ is charged with assessing a claimant's RFC "based on all the relevant

evidence in [the] case record."  *Id.*; *see also* 20 C.F.R. § 404.1546(c) ("If your case is at the

administrative law judge hearing level . . ., the administrative law judge . . . is responsible for

assessing your residual functional capacity."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149,

157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional capacity

rests with the ALJ, not a physician.").

Here, the ALJ concluded that Ms. Whitted had the following mental RFC:

> . . . to perform medium work . . . except: . . . . She can do no complex tasks but can
> do simple (routine) tasks which I define to mean this person has the basic mental
> aptitude to meet the demands of competitive, remunerative, unskilled work
> including the abilities to, on a sustained basis, understand, carry out, and remember
> simple instructions. She can do detailed, but not complex tasks. She can make
> simple work-related decisions. She can respond appropriately to supervision,
> coworkers, and usual work situations; and can deal with changes in routine work
> settings. She can focus attention on simple or routine work activities for at least 2
> hours at a time and can stay on task at a sustained rate such as initiating and perform
> a task that they understand and know how to do. She can work at an appropriate
> and consistent pace and can complete tasks in a timely manner. She can ignore or
> avoid distractions while working; can change activities or work settings without
> being disruptive. She can do no high production quotas or piece rate work. And she
> can have superficial, occasional interactions with public, co-workers meaning
> limited to speaking, signaling, taking instructions, asking questions and similar
> contact but with no arbitration, negotiation, confrontation, supervision, or
> commercial driving.

(Tr. 15-16.)

Ms. Whitted argues first that the ALJ "lack[ed] a logical bridge" when he found Dr.

Whitlow's medical opinion was "unpersuasive," despite finding the state agency consultant

opinions "somewhat persuasive"; she argues this is inconsistent because the state agency

consultants found Dr. Whitlow's opinion "supported and consistent."  (ECF Doc. 9, p. 13 (citing

Tr. 62, 80).)  This argument lacks merit for multiple reasons.

24

As an initial matter, there is no automatic conflict between finding a state agency opinion "somewhat persuasive" and declining to adopt the state agency doctor's specific findings as to another medical opinion, since "there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim[.]" *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). The ALJ provided a clear analysis to support his finding that the state agency opinions were "only somewhat persuasive" (Tr. 23) and had no obligation to adopt those doctors' findings regarding Dr. Whitlow's opinion.

Further, this Court sees no clear conflict between the state agency consultants' cursory findings regarding Dr. Whitlow's opinion—specifically, that her findings of certain "limitations" (of unspecified degree) were "supported and consistent with the narrative" (Tr. 62, 80)—and the ALJ's similar finding that Dr. Whitlow's "overall conclusion that the claimant had significant mental health impairments leading to functional limitations was consistent with the record as a whole" (Tr. 24). The ALJ's further finding that Dr. Whitlow's "vague and imprecise" statements regarding functional limitations were "minimally helpful in determining the claimant's remaining abilities in functional terms" (Tr. 24-25) simply provides additional analysis beyond that addressed by the state agency consultants. Plaintiff has failed to show that the ALJ's analysis did not build a logical bridge between the evidence and the result.

Ms. Whitted argues second that the ALJ erred because he formulated the mental RFC "without finding any medical provider's opinion persuasive," asserting that "[t]he basis for the ALJ's RFC cannot be determined if no medical provider's opinion is considered persuasive." (ECF Doc. 9, p. 14.) This assertion is contrary to Sixth Circuit law.

An ALJ must determine the RFC based on the relevant evidence in the record, including medical opinion evidence. *See* 20 C.F.R. §§ 404.1545(a)(1), 404.1546(c); *Poe*, 342 F. App'x at

157.  But an ALJ is "not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding."  *Poe*, 342 F. App'x at 157.  In fact, the Sixth Circuit has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."  *See Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) (citing *Shepard v. Comm'r of Soc. Sec.,* 705 F. App'x 435, 442–43 (6th Cir. 2017); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)).

The Sixth Circuit has explained that requiring an ALJ to base his RFC on a medical opinion could confer on the relevant medical provider "the authority to make the determination or decision about whether an individual is under a disability," which "would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Rudd*, 531 F. App'x at 728 (internal quotation and citation omitted); *see also Livingston v. Comm'r of Soc. Sec.*, 776 F. App'x 897, 901 (6th Cir. 2019) ("To the extent that Livingston's 'lay opinion' critique reflects discomfort with the ALJ's evaluating functional capabilities at all, that, of course, is precisely the ALJ's role.") (internal citation omitted); *Poe*, 342 F. App'x at 157 (finding "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding").  Ms. Whitted's argument that the ALJ "exceeded his role" by determining her RFC without finding a specific medical opinion "persuasive" must therefore fail.

Finally, Ms. Whitted argues that the ALJ "cherry-pick[ed]" the evidence, relying only on "evidence that resulted in a less restrictive RFC," and "failed to fully consider the issue of sustainability."  (ECF Doc. 9, p. 14.)  In support, she highlights the limitations she reported to her providers and asserts that the ALJ erred by giving "minimal consideration" to Dr. Whitlow's

opinion and by dismissing the work-related limitations arising from her mental impairments.  (*Id.* at pp. 14-15.)  The Commissioner asserts that this argument "is nothing more than a thinly disguised request for the Court to reweigh the evidence."  (ECF Doc. 11, p. 12.)

An ALJ may not cherry pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.  *See, e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014); *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013).  However, "an ALJ does not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to a claimant's position."  *Solembrino v. Astrue*, No. 1:10-CV-01017, 2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011).  Indeed, arguments that an ALJ has cherry picked evidence are "seldom successful because crediting it would require a court to re-weigh record evidence."  *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014) (citing *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir. 2009)).

Here, the ALJ considered—and discussed in some detail—the following evidence in support of his mental RFC findings: Ms. Whitted's subjective complaints to SSA (Tr. 14-15, 20); clinical findings and medical opinions from her consultative examination (Tr. 14-15, 21, 24-25); subjective complaints, clinical findings, and treatment modalities from her treatment records (Tr. 14-15, 18-22); state agency medical opinions (Tr. 14-15, 23-24); the lack of opinion evidence supporting greater RFC limitations (Tr. 21); the conservative nature of her treatment (Tr. 21-22); evidence of treatment noncompliance (Tr. 22); and evidence suggestive of efforts to engage in post-onset work activities (Tr. 22-23).

In arguing that the ALJ's RFC analysis is inadequate, Ms. Whitted points to evidence that she complained to providers and the consultative examiner about functional limitations caused by her mental impairments, like feeling overwhelmed, not attending to activities of daily living

or attending appointments, struggling to interact, and isolating at home (ECF Doc. 9, p. 14 (citing Tr. 317, 328, 329, 355, 369-70, 504, 873), noting that related limitations were articulated in Dr. Whitlow's medical opinion (*id.* (citing Tr. 508)). To the extent this argument is intended to rearticulate Ms. Whitted's arguments from the first assignment of error, the Court will not revisit the findings made in Section VI.B., *supra*.

To the extent Ms. Whitted is making a broader argument that the ALJ failed to consider specific evidence in his RFC analysis—i.e., evidence of Ms. Whitted's subjective complaints regarding her functional limitations—that argument is not supported by the record. The ALJ's written decision reflects that he considered Ms. Whitted's subjective complaints of difficulty remembering, unhealthy social and interpersonal functioning, panic attacks around others, desire not to be bothered by others, difficulty working due to panic attacks, difficulty completing work-related tasks, and scattered thinking and communication patterns (Tr. 14-15), but considered those complaints in the context of her clinical findings, conservative treatment history, treatment noncompliance, post-onset work activities, and the medical opinions (Tr. 14-15, 18-25) before adopting a mental RFC that specifically took Ms. Whitted's subjective complaints into account (Tr. 16, 20). Ms. Whitted has not met her burden to show that the ALJ cherry-picked evidence or otherwise lacked substantial evidence to support the mental RFC limitations.

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406. That means, even if there is substantial evidence to support additional mental RFC limitations, this Court cannot overturn the ALJ's mental RFC findings "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

For the reasons set forth above, the Court finds the ALJ did not fail to build a logical bridge, overstep his role, or cherry pick evidence when assessing Ms. Whitted's mental RFC. The Court further finds that the ALJ's mental RFC was supported by substantial evidence. Accordingly, the Court finds Ms. Whitted's second assignment of error is without merit.

### VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

March 12, 2025

> /s/Amanda M. Knapp
> AMANDA M. KNAPP
> United States Magistrate Judge